UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| vs. | CRIMINAL NO. 3:25-CR-08 (VAB) |
| ORLANDO GUZMAN | July 24, 2025 |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Orlando Guzman will appear before the Court on August 13, 2025, to accept the sentence this Court deems appropriate for his guilty plea to one count of Production of Child Sex Abuse Material in violation of 18 U.S.C. §§ 2251(a) and 2255(e), and one count of Possession of Child Pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2252A(b)(2). *See* ECF No. 55. Mr. Guzman is deeply ashamed of his misconduct and has endeavored to handle this case in a manner that respects the victims and their pain. Counsel has prepared this memorandum to provide additional insight into his life for the Court's consideration in determining an appropriate sentence.

**I.  UNDERLYING CONDUCT AND ACCEPTANCE OF RESPONSIBILITY**

Mr. Guzman sexually abused his twelve-year-old granddaughter over a period of six months. Some of that abuse was filmed. Mr. Guzman knows that his actions were unlawful, unforgiveable, and that he abused the precious trust of his grandchild. Mr. Guzman understands that he has caused his granddaughter (and family) irreparable harm, and that his granddaughter likely will bear the scars of psychological trauma for the remainder of her life. That is his doing, and he must live with the guilt and shame.

Mr. Guzman also accepts responsibility, without excuse or justification, for possessing approximately 5,000 images and videos containing child sexual abuse materials (CSAM). He

understands that his actions with respect to those images caused continued harm to the children depicted therein, including both the known and unknown victims.

Mr. Guzman will serve the sentence this Court imposes and leave his granddaughter and his victims alone. He pleaded guilty to the additional count of possession to demonstrate his genuine acceptance of responsibility and, hopefully, to provide his minor victims with additional access to resources. He has endeavored to handle this case with as little additional turmoil for the victims as possible.

## II. HISTORY AND CHARACTERISTICS OF ORLANDO GUZMAN

Mr. Guzman is seventy-three years old and in poor health. There is a strong likelihood that he will die in prison. He has lost all family support, and his age and frailty will make him more susceptible to victimization by other prisoners, especially given the nature of his crimes. Those who commit atrocious crimes, however, remain human and can have admirable qualities. Mr. Guzman has been a model client, consummately polite and receptive to advice while facing a bleak legal landscape. He immediately demonstrated an interest in pleading guilty and trying to handle a terrible situation with as much grace as the situation allows. The delay between the filing of the complaint and final resolution through a plea agreement should be attributed to counsel and the course of proceedings, not a lack of willingness to accept responsibility. Mr. Guzman has repeatedly demonstrated remorse to undersigned counsel and members of the defense team.

### a. CHILDHOOD AND AWKWARD ADOLESCENCE IN PUERTO RICO

Mr. Guzman was born in 1951 in an Army hospital in San Juan, Puerto Rico. His father was a career enlisted soldier, who would go on to fight in the Vietnam War, and his mother was a homemaker. Three of the father's children were born—during the marriage with Mr. Guzman's mother—to other women, but Mr. Guzman's mother forgave his father's continued wanderings and

raised all eight children as her own. She also legally adopted them. Mr. Guzman describes his mother as a saint and "the best mother ever." He has fond and vivid memories of her always having a snack ready for him when he returned from school, as well as a cookie and milk before bedtime. When Mr. Guzman turned 18 and started to work at the hospital, his mother continued to have snacks ready for him when he returned home each evening. Mr. Guzman describes his childhood as normal and enjoyable.

Things could not have been as copacetic as Mr. Guzman recalls. The father was an alcoholic and spent most of Mr. Guzman's childhood away on a series of two-year deployments. When pressed, Mr. Guzman admits that he observed alcohol abuse and at least some level of domestic violence. Surely, three out-of-wedlock children were not the sign of a healthy marriage, or at least a traditional one. Relying on a single enlistee's salary, the family was of modest means, sometime forced to stretch food in the cupboard to last until the next paycheck. The passel of children created a chaotic, but loving, environment.

Mr. Guzman was close with his siblings, and he remembers playing games with them, and the innocent pranks they played on each other—like having mudfights *after* a shower—still bring a smile to his face. Mr. Guzman was particularly fond of his older brother, Xavier, who acted in some ways as a surrogate father, and someone to whom Mr. Guzman looked for guidance. Mr. Guzman's best childhood memory, in fact, is when Xavier took him to his first professional baseball game, a magical day for ten-year-old Orlando. Later, the older brother would introduce him to DiscoTecs, concerts, and dancing. Mr. Guzman was a well-behaved child and teenager, and he had no disciplinary issues in school or encounters with the juvenile justice system. Although he has lost contact with almost all his family during the pendency of this case, Mr. Guzman maintained strong and positive relationships with a large swath of his immediate and extended family for most of his life.

### b. Military Service, Abandonment, Raising Children, Hospital Transport Work

After graduating high school with decent but unremarkable grades, Mr. Guzman worked for a hospital in San Juan as a security guard and continued to live at home with his parents. A relative helped him obtain the job, and after proving himself to be a reliable employee, Mr. Guzman was promoted to the position of orderly, transporting patients. He found real joy in his work, however simple it may have been, and he relished interacting with patients and their families. Mr. Guzman was also proud to help contribute to the family's support, voluntarily helping to pay for bills and groceries. Mr. Guzman struggled with his own intimate relationships, however, as he was extraordinarily shy and overweight. In fact, he did not start dating until his twenties, and he carried a largely negative self-image throughout most of his adult life. *See* Ex. 1, Report of Francisco Lopez, Ph.D. (July 21, 2025) (sealed) at 5.

Mr. Guzman eventually married a woman named Adaluz, with whom he would have three sons in approximately three years. The increased financial burden and need for medical benefits led Mr. Guzman to enlist in the Army. During his four years of service, Mr. Guzman was stationed in both Georgia (U.S.) and Frankfurt (Germany). He brought his wife and children with him to Georgia (one was born there), where they lived in a mobile home off-base, but when he was transferred to Germany, he and his wife agreed it was too far away to drag the children. Adaluz returned to Puerto Rico with the three young boys. Unfortunately, the marriage would not survive the distance, and Adaluz abandoned Mr. Guzman and the children, leaving the older two boys with Mr. Guzman's parents and the youngest with her sister. Mr. Guzman was able to come home on emergency leave long enough to get the youngest son moved in with his parents, but his military commitment required him to complete his term of service. Mr. Guzman then separated voluntarily (with an honorable discharge) and returned to Puerto Rico to raise his boys. He knew what it was like to have a largely

absent father—despite many fond memories of the same—and he was determined to be more present in his boys' daily lives. With Adaluz nowhere to be found, Mr. Guzman had to post notice of his divorce petition in the newspaper to accomplish service of process.[1]

As someone who has always struggled with his weight, Adaluz's abandonment was a blow to Mr. Guzman's ego, as well as his emotional stability—and he realizes now it is something he never addressed properly. Instead, he focused on the daily tasks required of him and returned to work at the hospital, gradually moving into a supervisory position, where he coordinated staffing for the medical records division. He never earned a high salary, but he did earn a pension, and would later retire from the hospital with 37 years of total service. Mr. Guzman lived a modest life in San Juan with his sons, parents, and extended family, and he is proud that he helped support his parents into their old age.

Focused on raising his sons, Mr. Guzman remained single for a considerable period of time following the divorce. He also—at least in hindsight—floundered emotionally throughout much of adulthood. By his forties, loneliness had taken a toll, and Mr. Guzman found himself drinking two six-packs of beer per day, a habit he maintained for approximately seven years. *See* Ex. 1 at 3. Alcohol abuse impacted his relationships with his children and his health, and may also explain why some dates in this stretch of his life are muddy in his head. He eventually found religion and a second wife, and both helped Mr. Guzman stop drinking. He is proud to be sober for over 25 years and has had no cravings for alcohol. Processing the events at issue in this case, however, he understands that he may have replaced one addiction (to alcohol) with another (to pornography and CSAM) without

---

[1] Close comparison of the Presentence Report and Dr. Lopez's report will reveal relatively minor discrepancies with respect to the timeline of events in Mr. Guzman's life. Counsel respectfully suggests those discrepancies are the result of an elderly man recounting what happened long ago, and not an attempt to mislead or misstate.

adequately addressing the underlying psychological drivers. The death of one of his sons (he believes from addiction) in 2000, caused him more emotional pain than the abandonment of his wife. "The death of his son continues to deeply affect him emotionally—he tearfully reported [to Dr. Lopez] that he cannot see a photo of his child without crying." *Id.* at 2.

   c. **Declining Health in Old Age**

Mr. Guzman is no longer a young man, and he suffers from a battery of medical issues befitting his age: ███. He has been taken to the hospital several times during his time at Wyatt for, alternately, ███. Mr. Guzman takes medication for each of his conditions—between 7 and 10 daily medications, depending on the most recent medical assessment. He underwent ███ surgery for ███ in 2005, and that prevented precipitous decline at the time. Mr. Guzman's weight has ballooned again in custody, however, and he is again considered to be ███. That has impacted his mobility and worsened his knee pain. During most visits with counsel, Mr. Guzman employs the use of a cane. He is compliant with his medications and tries to watch what he eats, acknowledging that it is difficult to maintain a healthy diet while incarcerated.

Mr. Guzman would benefit from a medical facility in the BOP, and specifically one with Spanish-speaking mental health and medical providers. His Wyatt records reflect Mr. Guzman repeatedly reporting feeling depressed but not expressing any suicidal ideation. Oddly, his Wyatt records lack any mental health diagnosis—although he is receiving anti-anxiety medication. The records also reveal numerous data points of high blood pressure, at least four trips to a local Emergency Department in RI for ███. Despite pain and discomfort, he is described as "cooperative and engaged," attentive, and polite.

6

Dr. Lopez's report discusses how Mr. Guzman has aged significantly while at Wyatt. Ex. 1 at 3 ("His appearance was notable in that he appeared much older than the photo taken of him in preparation for his PSI."). That is consistent with what counsel has observed. On that issue, Dr. Lopez offers the following:

> Another important issue is the effect of a lengthy sentence on Mr. Guzman's life expectancy. For the general male population, the average life expectancy is 75 years. It is well established that for every year spent in prison, life expectancy decreases by approximately two years. Mr. Guzman is 73 years old. The consequences are dire considering his age and medical condition. A lengthy prison sentence would likely accelerate the decline of his health and significantly reduce his remaining years, especially if his health is not carefully monitored.

Ex. 1 at 11.

Mr. Guzman understands the Court will impose a significant prison sentence, and he has made peace with that. He hopes, however, that he might be lucky enough to leave prison, albeit on supervised release, before he passes away.

### III. THE PSR ACCURATELY CALCULATES THE SENTENCING GUIDELINES, WHICH EXCEED WHAT IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO ACHIEVE THE AIMS OF SENTENCING

The Presentence Report correctly calculates the sentencing guidelines in this matter, resulting in a total offense level of 42 (after acceptance of responsibility), Criminal History Category I, and a Guidelines range of 360 to 600 months imprisonment. PSR ¶¶ 25-40, 45, 78. The calculation includes enhancements due to the age of the Minor Victim (**+2** under §2G2.1(b)(1)(A)), sexual contact with the Minor Victim (**+4** under §2G2.1(b)(2)(A)), the grandparent/grandchild relationship between Mr. Guzman and the Minor Victim (**+2** under §2G2.1(b)(5)), use of a computer to facilitate the production of CSAM (**+2** under §2G2.1(b)(6)(B)(i)), and the ongoing and extended duration of the abuse against Minor Victim (**+5** under §4B1.5(b)(1)). Mr. Guzman has taken responsibility for a prior instance of

improper sexual touching of a minor, but he has no criminal history, yielding a criminal history score of **0**.

The parties agreed to a higher total adjusted offense level in the plea agreement by including an enhancement (of **+4**) under U.S.S.G. § 2G2.1(b)(1)(A) due to the age of the Minor Victim (granddaughter). During preparation for sentencing, the parties and Probation verified that the Minor Victim was 12 years and one month old at the time the abuse began, and not 11. That difference led to the reduction of Probation's guidelines calculation—i.e. applying an enhancement of two levels (+2) instead of four. The Government contends that the Court may include the age of CSAM victims as relevant conduct when assessing the enhancement. The defense leaves that matter to the Court. Mr. Guzman understands that regardless of his granddaughter's age, what he did is unforgiveable.

When dealing with the conduct at issue in this case, counsel respectfully surmises that it may be the overall analysis of the 3553(a) factors that drives the Court's sentence, and not this limited Guidelines issue. Sadly, regardless of whatever reasonable sentence this Court imposes, there is a strong possibility that Mr. Guzman will die in prison.

### a. A Guidelines Sentence is Not Necessary to Achieve the Aims of Sentencing

The Court is bound by the dictate of 18 U.S.C. § 3553(a) to "impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing. Consequently, as the Second Circuit explained in *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006), if the Court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, it must choose the lower sentence. *See id*. at 142 (where a Guidelines sentence is "in equipoise with [a] below-the-range sentence," the parsimony clause requires imposition of the lower sentence). In the present case, the guidelines drastically exceed not only Mr. Guzman's remaining

expected lifetime but also exceed what is necessary to prevent future harm when considering a realistic assessment of future risk.

Mr. Guzman has not received meaningful counseling or rehabilitation during his time in pretrial detention at Wyatt, and the defense asks the Court to recommend placement in a facility with a Sex Offender Treatment Program (SOTP). Of course, there is some level of declining return given his heightened age, and to the extent BOP must prioritize health over treatment, the defense seeks placement at a facility that will accommodate Mr. Guzman's continued decline. There is little reason to doubt that United States Probation will be able to safely supervise Mr. Guzman if he lives beyond his prison term, and that he can and will achieve relative success on supervised release. He understands that, should he be so fortunate, he will be supervised for the remainder of his life.

### b. Mr. Guzman's Genuine Acceptance of Responsibility and Advanced Age Support a Non-Guidelines Sentence

Mr. Guzman cannot unwind the harm he has caused. There is something to be said for true acceptance of responsibility, however. Mr. Guzman remains a family-oriented man who has sacrificed for his family and continues to support them. He has not tried to evade responsibility in this case, and there was never a push for a public trial or proceedings that would heighten the anxiety and pain of his victims. A guidelines sentence will far exceed the time Mr. Guzman has, realistically, left to live.

### c. A More Severe Sentence is Not Necessary for General or Specific Deterrence

A lengthy prison term would not achieve the aims of deterrence. As a 2012 review of the studies that have examined the deterrent effect of sentence severity concludes, "the vast majority of these comprehensive summaries found no convincing evidence suggesting that harsher sentences deter." Cheryl Marie Webster and Anthony N. Doob, *Searching for Sasquatch: Deterrence of crime*

*through sentence severity*, The Oxford Handbook on Sentencing and Corrections (2012): 173-195, at 176. Recognizing that "effective deterrence arises from certainty, not harshness, of punishment," a decision in the Eastern District of New York sensibly asks whether "our society might better consider whether our scarce resources would be better spent, not on extended incarceration, but on eliminating social conditions encouraging crime and on non-incarceratory techniques." *United States v. Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011) (Weinstein, J.); *see also* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("increases in severity of punishments do not yield significant (if any) marginal deterrent effects.").

With respect to specific deterrence, the Court can tailor conditions of release to protect the public and keep Mr. Guzman from committing future crimes if and when he reaches supervised release. The risk assessment is described below and in Dr. Lopez's report.

### d. The Proposed Sentence Will Promote Respect for the Law

Finally, a harsh sentence here will not promote greater respect for the law. "A society that sets an example of naked, pitiless vengeance will not promote respect for the law or compliance with the law's dictates." *United States v. Mattox*, 417 F. Supp. 343, 345 (S.D.N.Y. 1976). "The line between sternness and cruelty cannot be seen with mathematical precision. It must be espied by whatever light we can find. When the balance is uncertain, our law, like our professed morality, tells us to err on the side of mercy." *Id.* A non-guidelines sentence that may very well exceed Mr. Guzman's natural life is going to be sufficient to send the message to Mr. Guzman and others aware of his case that his misconduct warranted serious punishment.

e. **Need for Psychological and Sex Offender Treatment and a Level of Risk that Can be Treated at a Location Like FMC Devens and Adequately Mitigated and Managed on Eventual Supervision**

During undersigned counsel's representation of Mr. Guzman, he has been honest and unflinching in accepting responsibility and describing his misconduct, and he has requested placement in a BOP facility that offers treatment related to his offense conduct. Mr. Guzman was similarly forthright during the psychological testing and risk assessment performed by Dr. Lopez. Ex. 1 at 4 ("Mr. Guzman answered all questions posed to him in a forthright manner and consistently."). Testing revealed Mr. Guzman to be of high average intelligence, with some limited memory issues, and "generally intact neurocognitive abilities." *Id.* His development was somewhat stunted, due to shyness and negative body image, and that may have promoted his escalating addiction to CSAM. *Id.* at 5, 6. Nevertheless, Mr. Guzman presents as lower risk than many peers with similar offense conduct. For example, Mr. Guzman's scores on the Child Pornography Offender Risk Tool (CPORT) and Correlates of Admissions of Sexual Interest in Children Scale fall within the average to low average range, reflecting less future risk than the common perception of someone with his offenses of conviction:

> In the normative sample, roughly 23% had the same scores, 46% had lower scores, and 31% had higher scores. Mr. Guzman's score, when compared to the CPORT normative sample, places him at an estimated recidivism rate of 13% for any sexual recidivism and 7% for any child pornography recidivism.

Dr. Lopez Report, Ex. 1 at 7. With respect to the Sexual Violence Risk-20 (Version 2) measure, Mr. Guzman displayed four risk factors and two partial risk factors out of twenty. *Id.* at 8. His attitude towards his offenses greatly contributes to the relatively positive future outlook: "Fortunately, Mr. Guzman does not exhibit any minimization or denial of his offenses. He assumes accountability for his actions and expresses sincere remorse. He does not endorse current attitudes that support his

11

offenses, and he does not hold any negative attitudes towards intervention or supervision." *Id.* at 8. Finally, testing on the Static-99 places Mr. Guzman at "Very Low Risk" for being convicted or charged with another sexual offense, and his results from the Stable 2007 measure "place[]him in the low-density range of risk factors." Dr. Lopez Report, Ex. 1 at 8, 9.

> Mr. Guzman's combined Static-99R and Stable-2007 score placed him in the risk ratio Level I. Individuals at this risk level are expected to have roughly one-quarter the rate of recidivism compared to the average individual convicted of a sexually motivated offense. Individuals placed in Level I are considered to be at very low risk, as defined by the standardized risk level framework. Their risk for new sexual criminal behavior is no different from the rate of spontaneous, first-time sexual offending among individuals with a non-sexual criminal history. Most individuals placed in Level I are expected to desist from criminal behavior.

*Id.* at 9.

Probation recommends a rider of special, sex-offender-targeted conditions of supervised release that would further reduce the risk of future harm. Those conditions include sex offender registration, monitoring of electronic devices, no contact with minors, monitoring of finances, and mental health and sex-offender counseling and treatment. The defense respectfully requests that the Court adopt those conditions with only one minor adjustment: Mr. Guzman's retirement funds were supporting the Minor Victim's family at the time of the offense conduct and throughout the pendency of this case. The defense has requested a slight revision to the proposed condition of release prohibiting contact with the Minor Victim so as to allow limited contact with the Minor Victim's father for purposes of coordinating finances.

IV. **CONCLUSION**

This is a sad case in which Mr. Guzman caused real and permanent harm to someone who loved and trusted him. Mr. Guzman is deeply ashamed of what he has done, and he expects to carry tremendous guilt with him to the grave. Mr. Guzman also perpetuated the continuing harm resulting

from the online marketplace of CSAM. Mr. Guzman acknowledges his misconduct and has endeavored to handle this case as gracefully as the situation allows. He will accept the sentence the Court decides is appropriate, considering all § 3553(a) factors, and seeks placement at a BOP facility that can accommodate his increasing medical needs and provide Sex Offender treatment. The Court can and should impose the Special Conditions of Supervised Release outlined in the PSR to mitigate future risk and provide Mr. Guzman with the support he will need should he survive his prison term.

Respectfully Submitted,

THE DEFENDANT,
ORLANDO GUZMAN

FEDERAL DEFENDER OFFICE

Date: July 24, 2025      /s/ Josh Ewing
Josh B. Ewing, ct443715/phv20199
Assistant Federal Defender
10 Columbus Blvd, 6th FL
Hartford, CT 06106
Phone: (860) 951-6664
Email: josh_ewing@fd.org

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 24, 2025, a copy of the foregoing pleading was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Josh Ewing
Josh B. Ewing